# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

TERESA LAVIS,

                Plaintiff,

v.                                            CIVIL ACTION NO. 5:17-cv-00209

REVERSE MORTGAGE SOLUTIONS, LLC,

                Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the Plaintiff's *Complaint* (Document 1-1), the *Defendant's Motion to Dismiss* (Document 6), *Defendant Reverse Mortgage Solutions Inc.'s Memorandum in Support of Rule 12(b)(6) Motion to Dismiss* (Document 7), the Plaintiff's *Memorandum in Opposition to Defendant's Motion to Dismiss* (Document 8), and the Defendant's *Reply Memorandum in Support of Motion to Dismiss* (Document 10).[1] In addition, the Court has reviewed all attached exhibits. For the reasons stated herein, the Court finds that the motion should be granted in part and denied in part.

## FACTUAL ALLEGATIONS

The Plaintiff, Teresa Lavis, sought a reverse mortgage in 2013 to obtain money to financially assist her mother. A realtor told Ms. Lavis that her home was worth approximately

---

[1] Both parties failed to fully comply with the Local Rules of Civil Procedure. The Defendant attached exhibits to its supportive memorandum, rather than to its motion, as specified by L.R. Civ. P. 7.1(a)(1). The Plaintiff's response exceeds the standard page limit of twenty (20) pages set forth in L.R. Civ. P. 7.1(a)(2). The Court urges counsel to review the Local Rules and ensure that *all* future filings are in compliance.

$160,000, and she owed less than $14,000 on her existing mortgage. She called Defendant Reverse Mortgage Solutions (RMS) after finding its phone number online, and was directed to Scott Shindle, who then acted as her loan officer. Mr. Shindle told Ms. Lavis that she "would never have to make a house payment again," would not have to pay any interest, and described an RMS reverse mortgage as a "government loan." (Compl. at ¶¶ 44-46.)

Mr. Shindle arranged for an appraisal, which was conducted by Lori Noble. Ms. Noble viewed the exterior of the home, and Ms. Lavis paid her $150 for the appraisal. Mr. Shindle informed Ms. Lavis that he had received the appraisal, but claimed he could not legally disclose the amount to her. Mr. Shindle also helped arrange Ms. Lavis' legally mandated loan counseling. He arranged for her to speak with an out-of-state counselor over the telephone. Ms. Lavis alleges that the "counselor had undisclosed, prior business dealings with RMS," and "was not independent, free of conflicts, and dedicated solely to helping Ms. Lavis understand her best interests and the best financial options available." (*Id.* at ¶¶ 57-58.) The counseling session lasted less than five minutes. Ms. Lavis asked about alternatives to reverse mortgages and about RMS's reputation, but the counselor said he could not answer those questions. He further replied that "I am supposed to tell you that this is a great loan." (*Id.* at ¶ 63.)

The loan closing took place at Ms. Lavis' home on November 22, 2013. She signed a Settlement Statement that detailed $9,389.47 in settlement charges, a $13,577.57 payoff of her previous mortgage, and $22,967.04 in loan proceeds provided to Ms. Lavis. The total principal loan amount was $66,976.00. (Document 7-1).[2] The Settlement Statement includes a checked box stating "You do not have a monthly escrow payment for items, such as property taxes and

---

2 RMS attached the closing documents as exhibits to its motion to dismiss. Finding that these documents are integral to the complaint, and their authenticity has not been challenged, the Court will consider the contents of the documents.

homeowner's insurance. You may pay these items directly yourself," although the form lists $2,113.57 for homeowner's insurance as an "item required by lender to be paid in advance." (Settlement Statement.) Ms. Lavis also signed a Home Equity Conversion Loan Agreement. (Document 7-2.) That document includes a provision permitting RMS to withhold funds for property charges, including property taxes and hazard insurance, unless the borrower elects to pay such charges directly, in which case any withheld amounts must be returned. In addition, an Adjustable Rate Note, signed November 22, 2013, provides that the lender may require immediate repayment of the full amount of the principal loan plus accrued interest if the borrower(s) die, move, or fail to perform "[a]n obligation of the Borrower under the Security Instrument." (Document 7-3 at 3.) The property may be sold to enforce the demanded repayment. A Deed of Trust contains similar provisions, and specifies that the Secretary [of Housing and Urban Development] must approve acceleration of the loan for reasons other than the death of the borrower, including failure to meet obligations.

Ms. Lavis asserts that she did not understand the terms of the documents she signed at closing. In May, 2016, she learned that RMS "contracted for, imposed, received, and/or collected illegal and/or excessive fees, charges, and costs, including undisclosed fees and/or settlement costs up-charged or subject to hidden division, in violation of West Virginia law." (*Id.* at ¶ 66.) Specifically, she alleges that her loan principal totaled $66,978.00, and closing costs were $9,389.47, including an origination charge of $2,625.00. RMS charged a document preparation fee of $125 as well as fees for a credit report, flood certification, and recording. RMS also applied allegedly excessive title insurance charges, including a $718.10 agent commission to a company not licensed in West Virginia. RMS charged an additional $700 "settlement or closing fee," a

$200 "Notary Fee," and a $375 appraisal fee, for the same appraisal Ms. Lavis paid for directly at the time.

RMS also deducted $2,113.57 from the amount Ms. Lavis was to receive to pay a hazard insurance premium a year in advance. Although the insurance company returned the money to RMS, RMS sought an additional $1,946.71 from Ms. Lavis to pay for a different force-placed hazard insurance policy. RMS threatened to foreclose if Ms. Lavis failed to pay. She disputed the charge. RMS sent her a letter dated August 21, 2015, stating that "RMS would accelerate her loan immediately if she did not pay $1,310.33" in "taxes and insurance," although Ms. Lavis had paid the real estate taxes. (*Id.* at ¶ 73.) Ms. Lavis was charged for taxes paid on an unrelated property in Gwinnet County, Georgia. She again contacted RMS, contested the tax charge, and expressed willingness to set up a monthly payment plan for any amounts she owed. RMS instead demanded that she pay the full sum immediately. "On September 18, 2015, RMS sent Ms. Lavis a letter stating her loan was in default for failure to pay 'Property Taxes and Hazard Insurance,' and had been accelerated so that the entire principal balance (represented to be $72,929.82) was immediately due and payable." (*Id.* at ¶ 87.) The letter also indicated attorney's fees and expenses could be added, and offered Ms. Lavis the options of "paying the full loan balance, walking away, selling the home, or giving RMS a deed in lieu of foreclosure." (*Id.* at ¶ 88.) Alternatively, Ms. Lavis could pay the $1,310.33, representing "the Servicer's payment of the property charges." (*Id.* at ¶ 89.) RMS added fees to Ms. Lavis' account for several property inspections and two appraisals.

On March 8, 2016, an agent of RMS engaged in debt collection sent Ms. Lavis a letter asserting that she was in default in the amount of $1,946.71, and that her loan could be accelerated

4

if she did not pay that amount within ten (10) days. The same debt collector sent Ms. Lavis a second letter the same day, asserting that she was required to pay $74,313.06, but could dispute the claim within thirty (30) days. Several days prior to mailing those letters, another debt collection agent published notice that Ms. Lavis' home would be sold in a trustee's sale on April 6, 2016, but subsequent direct communications with Ms. Lavis did not inform her of the impending sale of her home. Ms. Lavis obtained counsel when she learned of the trustee sale about a week before it was scheduled, and the sale was cancelled temporarily. As of the filing of the complaint, RMS was continuing to bill Ms. Lavis for tax and insurance fees, and continuing to threaten her with foreclosure.

Ms. Lavis asserts that her experiences with RMS are typical of its business practices within West Virginia. In Count One of her complaint, she asserts class claims for illegal and excessive fees, charges, and costs, in violation of the West Virginia Residential Mortgage Lender, Broker and Servicer Act, the West Virginia Reverse Mortgage Enabling Act, and the implementing regulations. She also asserts seven individual claims. Count Two alleges unconscionable inducement. Count Three asserts misrepresentation. Count Four alleges unfair debt collection. Count Five asserts refusal of payment, in violations of W.VA. Code § 46A-2-115. Count Six asserts breach of contract. Count Seven asserts that Ms. Lavis properly rescinded the loan. Count Eight asserts failure to honor rescission.

## STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). "[T]he legal sufficiency of a complaint

is measured by whether it meets the standard stated in Rule 8 [of the Federal Rules of Civil Procedure] (providing general rules of pleading) . . . and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.)" *Id*. Federal Rule of Civil Procedure 8(a)(2) requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

In reviewing a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the Court must "accept as true all of the factual allegations contained in the complaint." *Erikson v. Pardus*, 551 U.S. 89, 93 (2007). The Court must also "draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). However, statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). Furthermore, the Court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice… [because courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal,* 556 U.S. at 678 (quoting *Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570.) In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly,* 550 U.S. at 570.) In the

6

complaint, a plaintiff must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief." *Francis,* 588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 557.) "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

## DISCUSSION

RMS seeks dismissal of Counts One, Three, Four, Six, Seven, and Eight of the complaint.

### A. *Count One – Illegal and Excessive Fees, Charges, and Costs*

RMS asserts that a two-year statute of limitations applies to fees and costs assessed at closing, and more than two years elapsed between the closing of Ms. Lavis' reverse mortgage and the filing of this suit. Ms. Lavis argues that consideration of the statute of limitations is premature, as the complaint does not contain all facts relevant to a determination. Further, Ms. Lavis asserts that she relies on multiple legal theories as to Count One, including the WVCCPA, which has a four-year statute of limitations. Ms. Lavis also argues that the West Virginia Residential Mortgage Lender, Broker, and Servicer Act (RMLBSA) is most comparable to a usury statute, which the West Virginia Supreme Court of Appeals found to involve continuing injury throughout the loan period, such that the statute of limitations would begin to run when the loan is fully paid, rather than at the time of origination.

West Virginia Code § 31-17-8 prohibits certain excessive and/or undisclosed fees associated with mortgages. Section 31-17-17(a) provides that a loan "made in willful violation of the provisions of this article…may be canceled by a court of competent jurisdiction." In West

Virginia, "A five step analysis should be applied to determine whether a cause of action is time-barred."

> First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action. Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled. And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine.

Syl. Pt. 5, *Dunn v. Rockwell*, 689 S.E.2d 255, 258 (W. Va. 2009) (internal citation omitted).

The RMLBSA does not contain a statute of limitations provision, and the West Virginia Supreme Court of Appeals has not determined the appropriate statute of limitations for RMLBSA claims related to fees imposed at closing on a mortgage. However, federal district courts for both the Northern District of West Virginia and the Southern District of West Virginia have found that the standard two-year statute of limitations contained in W.Va. Code Section 55-2-12 generally begins to run at the time of injury, when the allegedly improper fees are imposed. *Fluharty v. Quicken Loans, Inc.*, No. 5:13CV68, 2013 WL 5963060, at *3 (N.D.W. Va. Nov. 7, 2013), *aff'd*, 623 F. App'x 65 (4th Cir. 2015); *In re Shaver*, No. 10-813, 2014 WL 3057951, at *2 (Bankr. N.D.W. Va. June 26, 2014); *Robinson v. Quicken Loans Inc.*, 988 F. Supp. 2d 615, 627–28 (S.D.W. Va. 2013) (Chambers, C.J.). Ms. Lavis challenges fees imposed at closing. Thus, the elements of the claim were complete on November 22, 2013, and she was aware of those

8

elements. Though she may not have been aware of the law under which those fees could be challenged, the Settlement Statement clearly lists the various fees. *See*, *Dunn v. Rockwell*, 689 S.E.2d 255, 265 (W. Va. 2009) ("The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action.") There is no allegation here that RMS concealed facts to prevent Ms. Lavis from pursuing a claim with respect to the origination and other challenged closing fees. As it is clear from the face of the complaint that more than two years had passed between the loan closing date and the initiation of this suit, and Ms. Lavis has not come forward with any allegations that, if proven, would permit tolling of the statute of limitations, the Court finds that claims under the RMLBSA are time-barred. The motion to dismiss Count One should be granted.[3]

### B. *Counts Three and Four– Misrepresentation and Unfair Debt Collection*

RMS argues that Counts Three and Four fail because the relevant provisions of the WVCCPA apply only to debt collectors. RMS asserts that it originated the debt at issue, and therefore, cannot be considered a debt collector. It further argues that the fees it attempted to collect "were charged in connection with the *origination* and *closing* of the Loan, not in connection with attempting to collect payments due under those loans." (Mem. in Supp. of Mot. to Dismiss at 11.) Moreover, RMS states the "taxes and insurance obligations were not sought through debt collection, but were merely Plaintiff's obligation per the terms of the loan agreement to maintain on the property, the violation of which constituted default of the Loan." (*Id.*) Ms. Lavis maintains that both the West Virginia Supreme Court of Appeals and federal courts interpreting

---

3 Ms. Lavis asserts that Count One encompasses claims involving later fees and other legal theories. Those claims appear to the Court to be adequately alleged in other counts. To be clear, the motion to dismiss Count One is granted only as to RMLBSA claims involving fees imposed on or before the loan closing date.

the WVCCPA have found that the statute, including the definition of "debt collection," should be broadly interpreted. She notes that courts have concluded that creditors may also be debt collectors under the WVCCPA.

The WVCCPA defines a "debt collector" as "any person or organization engaging directly or indirectly in debt collection." W.Va. Code § 46A-2-122(d).[4] "Debt collection," in turn, is defined as "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or alleged to be owed or due by a consumer." *Id.* at § 122(c). In 1980, the West Virginia Supreme Court of Appeals held, based on the plain meaning of those definitions, that "the provisions of Article 2 of Chapter 46A regulating improper debt collection practices in consumer credit sales must be applied alike to all who engage in debt collection, be they professional debt collectors or creditors collecting their own debts." Syl. Pt. 3, *Thomas v. Firestone Tire & Rubber Co.*, 266 S.E.2d 905, 906 (W.Va. 1980); *see also Fleet v. Webber Springs Owners Ass'n, Inc.*, 772 S.E.2d 369, 377 (W. Va. 2015) (again finding a creditor attempting to collect debt allegedly owed to it to be a debt collector). Federal courts in West Virginia have likewise permitted WVCCPA claims against creditors, even where federal Fair Debt Collection Practices Act claims cannot proceed. *See, e.g.*, *Patrick v. PHH Mortg. Corp.*, 937 F. Supp. 2d 773, 782 (N.D.W. Va. 2013); *In re Machnic*, 271 B.R. 789, 792 (Bankr. S.D.W. Va. 2002). In short, under the WVCCPA, whether a party is a debt collector is determined by its conduct, and those who take actions to collect alleged debts are debt collectors for purposes of the WVCCPA.

---

4 Although this definition is amended by CONSUMER CREDIT, 2017 West Virginia Laws S.B. 563 (West's No. 200), the new language adds an exclusion not applicable to the Plaintiff's claims without changing the quoted definition.

Nothing in the penalty provisions of the WVCCPA alters those conclusions. West Virginia Code Section 46A-5-101 does specify certain remedies available when violations are committed by the creditor, while others are available whether a creditor or debt collector committed the violation. Section 46A-5-101(1) provides certain remedies "[i]f a creditor or debt collector has violated the provisions of this chapter applying to…illegal, fraudulent or unconscionable conduct, any prohibited debt collection process…." In addition, the legislature amended the WVCCPA without changing the language defining "debt collector" that the West Virginia Supreme Court held included creditors engaging in debt collection, indicating that it did not intend to alter that holding. Thus, it is clear that the WVCCPA contemplates liability for creditors who engage in debt collection.

In addition to allegations regarding unlawful fees imposed at closing, Ms. Lavis alleges that RMS sought to collect alleged debts related to hazard insurance and property taxes. She further asserts that the debts were not properly assessed and RMS ignored her attempts to resolve the dispute. It sent her repeated notices demanding payment and threatening foreclosure, and even scheduled a foreclosure sale based on Ms. Lavis' failure to pay those alleged debts. Accordingly, the Court finds that Ms. Lavis has stated claims under the WVCCPA, and RMS's motion to dismiss Counts Three and Four should be denied.

### C. Count Six – Breach of Contract

RMS asserts that Ms. Lavis has not alleged a viable breach of contract claim because she alleges only a breach of the implied covenant of good faith and fair dealing, without alleging a breach of any express contract term. Ms. Lavis argues that her allegations are sufficient to survive a motion to dismiss.

State law governs contract disputes. In West Virginia, a claim for breach of contract requires "the existence of a valid, enforceable contract; that the plaintiff has performed under the contract; that the defendant has breached or violated its duties or obligations under the contract; and that the plaintiff has been injured as a result." *McNeely v. Wells Fargo Bank, N.A.*, No. 2:13-CV-25114, 2014 WL 7005598, at *9 (S.D.W. Va. Dec. 10, 2014) (Goodwin, J.) (citations and quotation marks omitted.) A breach of the duty of good faith implied in all contracts "does not give rise to an independent cause of action." *Doyle v. Fleetwood Homes of Virginia, Inc.,* 650 F. Supp. 2d 535, 540 (S.D.W. Va. 2009) (Copenhaver, J.). "[F]ailure to allege a breach of contract [is] fatal to [a] claim for a breach of the implied covenant of good faith and fair dealing." *Evans v. United Bank, Inc.*, 775 S.E.2d 500, 509 (W.Va. 2015).

Ms. Lavis clearly asserted that "RMS breached express provisions of the contract, as well as its duty of good faith and fair dealing." (Compl. at ¶ 113.) Though the complaint does not re-assert the factual basis to clarify precisely how RMS breached the contract provisions, the facts set forth in the complaint adequately state a breach of contract claim. For example, the Home Equity Conversion Loan Agreement permits Ms. Lavis to pay for taxes and insurance directly, and indicates that any money withheld for such purposes will be returned if she pays those charges. Ms. Lavis alleges that RMS withheld $2,113.57 for insurance, but the insurance company returned that money to RMS. RMS did not return the money to Ms. Lavis, but demanded an additional $1,946.71 from Ms. Lavis to pay for a different policy. Ms. Lavis also alleges that she paid the property taxes directly, but RMS charged her for taxes. The facts alleged, taken as true, therefore support a breach of contract claim, and the accompanying claim for breach of the duty of good faith and fair dealing may proceed. RMS's motion to dismiss Count Six should be denied.

### D. Counts Seven and Eight – Rescission and Failure to Honor Rescission

RMS argues that Ms. Lavis' rescission claims must fail because she does not allege that she assured RMS of her ability to return the loan proceeds when seeking rescission. Ms. Lavis argues that the Truth in Lending Act (TILA) does not require such an assurance.

TILA gives borrowers the right to rescind covered transactions within three days, or within three years if the lender failed to provide proper disclosure forms. 15 U.S.C. § 1635(a),(f). The borrower must provide written notice of the rescission, after which the creditor has twenty (20) days to "return any money or property…and shall take any action necessary to reflect the termination of the security interest." 12 C.F.R. § 1026.23(a), (d). After the creditor satisfies its obligations, the borrower must tender any money or property received from the creditor, or its reasonable value. *Id.* at § 1026.23(d)(3). The procedures for the return of money or property by both parties "may be modified by court order." *Id.* at § 1026.23(d)(4).

The Fourth Circuit considered the right of rescission in *American Mortgage Network, Inc. v. Shelton*, affirming a grant of summary judgment in favor of the lender. 486 F.3d 815 (4th Cir. 2007). There, the borrower had misrepresented his income and had used an appraiser who worked under his supervision to generate an allegedly inflated value of the home. *Id.* at 819. The borrower informed the lender that he could not return the loan proceeds, and instead offered to sell the home to the lender "for the difference between an appraised value of the house, $370,000, and the net loan proceeds, $313,468.39." *Id.* at 818. As the lender was not in the business of buying and selling homes, and believed the appraised value to be inflated, it declined to accept the tender or the rescission notice and brought suit to clarify its TILA obligations. The Fourth Circuit

13

determined that "[t]he trial court, in exercising its powers of equity, could have either denied rescission or based the unwinding of the transaction on the borrower's reasonable tender of the loan proceeds." *Id.* at 820. However, the Fourth Circuit noted that "the better practice may have been for the trial judge to set terms for rescission by allowing the [borrower] a time certain to tender the net loan proceeds." *Id.* at 821 (but finding the trial court's decision to be a reasonable exercise of discretion under the facts of the case).

The Fourth Circuit again considered rescission in *Gilbert v. Residential Funding LLC*, 678 F.3d 271 (4th Cir. 2012). There, the court separated "the issue of whether a borrower has exercised her right to rescind [from] the issue of whether the rescission has, in fact, been completed and the contract voided." *Gilbert*, 678 F.3d at 277. The written communication indicating an intent to rescind is sufficient to exercise the right to rescind, but "the creditor must acknowledge that the right of rescission is available and the parties must unwind the transaction amongst themselves, or the borrower must file a lawsuit so that the court may enforce the right to rescind" in order to complete the rescission and void the contract. *Id.* (citing *Shelton*, 486 F.3d at 821) (internal quotation marks and citations omitted). Like the instant case, *Gilbert* involved both a claim for rescission and a claim for statutory damages based on the lender's failure to honor the initial written rescission notification. The Fourth Circuit permitted both claims to proceed. *Id.* at 278-79.

The United States Supreme Court later provided clear guidance indicating that "all that a borrower must do in order to exercise his right to rescind under the Act" is provide the lender with written notice of the intention to rescind within the applicable statute of limitations. *Jesinoski v. Countrywide Home Loans, Inc.*, 135 S. Ct. 790, 793 (2015). The Court also noted that TILA

14

modified the common-law requirement that "the borrower tender the proceeds received under the transaction" as a condition precedent to rescission. *Id.*

The Court finds RMS's reliance on *Shelton* misplaced.[5] *Shelton* did not create a pleading standard requiring borrowers seeking rescission to state their ability to tender the loan proceeds at the outset. It simply found that rescission could not be properly completed in that case, following discovery, because the borrower could not or would not agree to return the reasonable value of the loan proceeds in a timely manner. The Fourth Circuit also emphasized that the outcome was a reasonable exercise of the trial court's discretion under the specific facts of the case, with other options available for managing rescission cases. Ultimately, as held in *Shelton*, Ms. Lavis will be required to tender the loan proceeds to return the parties to status quo ante in order to complete rescission and void the loan, and the Court could deny rescission if she is unable or unwilling to do so.[6] The Court and/or the parties, however, retain some flexibility under 15 U.S.C. § 1635(b) and 12 C.F.R. § 1026.23(d)(4), to determine how rescission should proceed under the circumstances presented. The Court finds that Ms. Lavis has adequately pled her claims for rescission and failure to honor rescission at this stage, and RMS's motion to dismiss Counts Seven and Eight will therefore be denied.

---

5 RMS cites other district court cases within the Fourth Circuit that have similarly relied on *Shelton* to dismiss rescission claims for a failure to allege or demonstrate the ability to tender any loan balance. Given the subsequent clarifications from the Fourth Circuit in *Gilbert* and the United States Supreme Court in *Jesinoski*, the Court does not find those cases persuasive to the extent they would impose a requirement that borrowers specifically plead their ability to meet the tender obligations at the beginning of the rescission process. Further, it does not appear that the Southern District of West Virginia has previously imposed any such pleading requirement. *See, e.g.*, *Lenhart v. EverBank*, No. 2:12-CV-4184, 2013 WL 5745602, at *6–7 (S.D.W. Va. Oct. 23, 2013) (Copenhaver, J.) (denying summary judgment where plaintiffs pled that they were prepared to tender if the court modified the rescission process, and produced evidence that the value of the home would be sufficient to secure a loan in excess of the tender amount).
6 Contrary to Ms. Lavis' contention, RMS's waiver of any claim that she repay the loan in the reverse mortgage contracts obviously does not impact the requirement that she repay the loan proceeds in order to complete rescission. Rescission is designed to void the loan and return the parties to their original positions, not allow borrowers to escape any repayment obligation while retaining the secured property.

**CONCLUSION**

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Defendant's Motion to Dismiss* (Document 6) be **GRANTED** as to Count One and **DENIED** as to Counts Three, Four, Six, Seven, and Eight. The Court specifically **ORDERS** that Count One of the Plaintiff's *Complaint* (Document 1-1) be **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: June 9, 2017

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA