# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

# BECKLEY DIVISION

TERESA LAVIS,

            Plaintiff,

v.                                                         CIVIL ACTION NO. 5:17-cv-00209

REVERSE MORTGAGE SOLUTIONS, LLC,

            Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Plaintiff's Motion for Partial Summary Judgment* (Document 27), the *Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment* (Document 28), *Defendant Reverse Mortgage Solutions, Inc.'s Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment* (Document 33), and the *Plaintiff's Reply Memorandum in Support of Her Motion for Partial Summary Judgment* (Document 38).

The Court has also reviewed *Defendant Reverse Mortgage Solutions, Inc.'s Motion for Summary Judgment* (Document 29), *Defendant Reverse Mortgage Solutions, Inc.'s Memorandum in Support of Motion for Summary Judgment* (Document 30), *Plaintiff Teresa Lavis' Memorandum in Opposition to Defendant Reverse Mortgage Solutions, LLC's Motion for Summary Judgment* (Document 36), and *Defendant Reverse Mortgage Solutions, Inc.'s Reply Memorandum in Support of Motion for Summary Judgment* (Document 39). In addition, the Court has reviewed all exhibits. For the reasons stated herein, the Court finds that the Plaintiff's motion should be denied and the Defendant's motion should be granted in part and denied in part.

## FACTS

The Plaintiff, Teresa Lavis, sought a reverse mortgage from the Defendant, Reverse Mortgage Solutions (RMS), in 2013 in an effort to obtain funds to care for her ill mother.[1] Ms. Lavis spoke with RMS loan officer Scott Schindler about how the reverse mortgage would work. She asserts that he told her the reverse mortgage was a government loan and that she would never have to pay interest or make a house payment again. She further avers that Mr. Schindler did not tell her that she would still need to pay taxes and insurance for her house, although she expected to continue paying taxes. Her insurance had previously been paid through her mortgage, and she did not understand that she would be required to obtain and pay for insurance directly. She testified at her deposition that Mr. Schindler told her she could expect to receive approximately 70% of the value of her home. Mr. Schindler arranged for an appraiser to visit Ms. Lavis' property on October 1, 2013, and Ms. Lavis states that she paid the $150.00 appraisal fee to the appraiser at that time. She asserts that Mr. Schindler told her that he was not permitted to disclose the appraisal results to her.

In June 2013, Ms. Lavis received loan counseling related to the reverse mortgage. In her affidavit, she asserts that someone from RMS "called and said that a counselor would call [her] at home," and set up the call with a loan counselor of her choice.[2] (Lavis Aff. at ¶11) (Document

---

[1] Ms. Lavis submitted an affidavit in support of her own motion and in opposition to the Defendant's motion. Her deposition was completed after briefing for motions for summary judgment. RMS filed a motion to supplement the record with Ms. Lavis' deposition transcript on April 24, 2018. Given the late completion of the deposition, the Court will consider both Ms. Lavis' affidavit and her deposition.

[2] Lauren Smith, an assistant vice president at RMS, submitted a declaration detailing RMS' position as to various factual issues in this case. She contends that RMS had no relationship with the loan counselor and did not steer Ms. Lavis to the counselor. The Plaintiff has requested that Ms. Smith's declaration be stricken or disregarded because Ms. Smith had no personal involvement in Ms. Lavis' loan, and her declaration is based only on her review of the documents that the Court may review on their own merit. The Court denies the request to strike the declaration, but will consider it only to the extent it (a) is helpful in directing the Court to certain documents and (b) contains information within Ms. Smith's knowledge, such as RMS' ordinary business practices.

36-1.) In her deposition, Ms. Lavis testified that RMS gave her a number and directed her to call it to receive the counseling. RMS denies having any business or other relationship with the loan counselor, Robert Packett, beyond maintaining a list of potential counselors. Ms. Lavis describes the conversation as brief and perfunctory, with Mr. Packett declining to answer her questions about RMS or alternatives to a reverse mortgage. She recalls Mr. Packett ending the conversation by saying "I am supposed to tell you that this is a great loan." (Lavis Acc. At ¶ 12.) She testified in her deposition that she does not recall much of the conversation, but that it was rushed and uninformative. She now asserts that, with accurate information about the nature of the loan and her options, she would have assisted her mother in getting a reverse mortgage on her mother's home, rather than getting one on her own home. She signed a Certificate of HECM Counseling form, which contains a certification that the loan counseling included discussion of financial implications and alternatives to a reverse mortgage, the available payment plans, the costs, when the loan would become due and payable, and other specified topics. (Document 33-1 at 11.) In her deposition, she testified that those topics were not, in fact, addressed.

Ms. Lavis completed a reverse mortgage loan application on September 5, 2013. She believes her home was worth approximately $180,000, based on a conversation with a realtor. She owed less than $14,000 on a traditional mortgage.[3] RMS used a home value of approximately $112,000. When Ms. Lavis signed the loan application and the comparison form, she also signed a form detailing the anticipated accrued interest and annual loan balance, home value, and net equity, a form listing the total annual loan cost, a Good Faith Estimate form estimating the

---

3 Ms. Lavis' affidavit asserts that she owed less than $140,000, which appears to be a typographical error based on the other evidence. Her complaint, and the loan documents themselves, indicate that she had an outstanding mortgage loan of $13,577.57, which was paid when she closed on the reverse mortgage.

settlement charges and closing costs, a Disclosure of Third Party Fees and Costs form, a Required Provider Disclosure form listing the providers of third-party services whose fees would be included at closing, a list of HUD approved counseling agencies,[4] an alternative contact form, a borrower identification disclosure form, and a counseling disclosure form.[5]

The loan closing took place on November 22, 2013, at Ms. Lavis' home. RMS sent a woman identified as a closing agent, and a notary. Ms. Lavis asserts that the closing was rushed, and the closing agent handed her papers, pointed out where to sign, then put the papers in a pile or handed them to the notary. She states that she did not understand the documents and did not have the opportunity to read or ask questions about them. She received copies of the papers in the mail sometime later. The papers signed at closing include an Adjustable Rate Note payable to RMS, a second Adjustable Rate Note payable to the Secretary of Housing and Urban Development (HUD), a Home Equity Conversion Loan Agreement, and two Adjustable Rate Deed of Trust documents, securing payment on the two Adjustable Rate Notes. She also signed the Settlement Statement, another copy of the Loan Application, and a Truth in Lending Disclosure form.

The Settlement Statement outlines the settlement charges and loan amounts. The settlement charges include $2,625 in "adjusted origination charges," $375 for appraisal fee, $15.15 for a credit report, $5.75 for flood certification, $2,240 for mortgage insurance premium, $2,113.56 for "homeowner's insurance for 1 years to State Farm," $1,715 for title service and lender's title insurance, $174 for government recording charges, and $125 for a counseling fee. (Settlement

---

[4] The Court notes that the list includes Smart Money Housing, which Ms. Lavis used. Ms. Lavis signed the list of counselors provided by RMS on September 5, 2013. She signed the form indicating that she received loan counseling from Mr. Packett on June 27, 2013.
[5] The counseling disclosure form has a box checked indicating that the lender provided a list of counseling agencies prior to counseling and did not direct the borrower to a particular agency, and another box checked opting for telephone counseling.

Statement, Document 27-2.) Those amounts were deducted from the cash settlement available to Ms. Lavis. The settlement statement specified an initial interest rate of 2.418%. The total principal of the reverse mortgage loan at closing was $66,976. Of that, settlement charges amounted to $9,389.47. An additional $13,577.57 was paid to United Bank to satisfy Ms. Lavis' prior traditional mortgage. Ms. Lavis received a lump sum of $44,008.96.

In a January 16, 2014 letter, RMS informed Ms. Lavis that it had no evidence of hazard insurance on file, and that it would purchase insurance and charge her if she did not provide insurance information. Ms. Lavis testified that she was unaware of her insurance coverage or the purchase of insurance, and she did not receive a refund from either RMS or an insurance company for the $2,113.56 withheld from her cash payment for insurance. A letter mailed February 14, 2014, from Aegis Security Insurance Company, contains a notice that Ms. Lavis' insurance policy would be cancelled on March 3, 2014.[6] RMS sent another letter on March 6, 2014, informing Ms. Lavis that records showed her insurance had been cancelled on March 3, 2014, and again indicating that it would charge her for force-placed insurance if she did not provide proof of insurance. Another letter, titled "Second and final notice," was dated April 10, 2014. A letter dated May 8, 2014, states that RMS had purchased insurance and that Ms. Lavis would be responsible for the $575 cost of the insurance, but could select her own and RMS would cancel the policy it had purchased. Additional letters informing Ms. Lavis that RMS would purchase insurance and charge her for it if she did not purchase her own were dated January 16, 2015, March

---

6 Neither RMS nor Ms. Lavis recall purchasing the Aegis policy. The policy reflects a policy period of December 30, 2013, through December 30, 2014, and a total premium of $1324.24. The issue date is January 2, 2014. (Document 27-2.)

13, 2015, January 22, 2016, and March 18, 2016. She does not recall receiving any of the letters related to insurance.

A letter dated July 9, 2014, requested that Ms. Lavis provide proof of payment of her property taxes, which were delinquent in the amount of $150.34 in RMS' review of tax records. RMS paid $29.38 for property taxes on March 3, 2016. That amount was returned, and documents show that the unpaid taxes were actually due on a property with the same street address in Buford County, Georgia. RMS claims that it adjusted the amount due downward by $29.38 on April 13, 2016. Ms. Lavis testified that she recalled sending RMS proof of payment of her property taxes at some point, but does not recall when.

A letter dated April 22, 2015, memorializes an agreement that Ms. Lavis would make payments of $56.97 per month for 24 months to satisfy a $1367.30 debt accumulated from homeowner's insurance payments. RMS' records reflect receipt of a single payment of $56.97. A letter dated August 20, 2015, states that the repayment plan was canceled due to failure to comply with its terms, and requested payment of the outstanding debt of $1,310.33. A letter dated August 21, 2015, states that she failed to pay taxes and insurance, owes $1,310.33, and that failure to resolve the matter could result in foreclosure. RMS sent a notice of default, dated September 18, 2015, advising Ms. Lavis that, to avoid foreclosure, she would need to either cure the default by paying $1,310.33 to reinstate the reverse mortgage loan, or pay the accelerated loan balance of $72,929.82. Another letter, dated March 8, 2016, sent by Reisenfeld & Associates, contains another notice of right to cure default, with a total amount in default of $1,946.71. Ms. Lavis testified that she did not recall receiving these letters, but does recall that she contacted an attorney and ultimately initiated this suit due to the threat of foreclosure.

6

Ms. Lavis sent a letter, dated May 12, 2016, stating: "This is notice that I rescind the November 22, 2013 loan and mortgage on my home at 235 Church St., Beckley, WV, effective today." (Lavis Rescission, att'd as Document 27-11.) The record does not contain a response from RMS. Ms. Lavis testified that she would need to obtain a loan in order to tender the proceeds of the reverse mortgage loan back to RMS and complete rescission.

In Count I of Ms. Lavis' complaint, she asserts class claims for illegal and excessive fees, charges, and costs, in violation of the West Virginia Residential Mortgage Lender, Broker and Servicer Act, the West Virginia Reverse Mortgage Enabling Act, and the implementing regulations. The Court granted a motion to dismiss count one based on the statute of limitations. She also asserts seven individual claims. Count II alleges unconscionable inducement. Count III asserts misrepresentation. Count IV alleges unfair debt collection. Count V asserts refusal of payment, in violations of W.VA. Code § 46A-2-115. Count VI asserts breach of contract. Count VII asserts that Ms. Lavis properly rescinded the loan. Count VIII asserts failure to honor rescission.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v.*

*Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish

the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd*, 474 F. App'x 101 (4th Cir. 2012). Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

**DISCUSSION**

Ms. Lavis moves for summary judgment as to her rescission claims contained in Counts VII and VIII, her WVCCPA claim for false, deceptive, and/or misleading debt collection practices, and her WVCCPA claim for attempts to collect unauthorized charges related to the loan closing. She argues that her notice of rescission was timely, valid, and effective, and she is entitled to statutory damages, costs, and attorney fees associated with RMS' failure to honor her notice of rescission. She further asserts that RMS' debt collection notices related to her property insurance and tax payments contained inaccurate amounts due, claimed that the loan had been accelerated before that was legally permissible, and attempted to collect amounts paid for insurance that did not exceed the amount withheld from Ms. Lavis at closing for the purchase of insurance. Ms. Lavis also argues that the closing costs included impermissible charges for a $700 settlement of

9

closing fee, for an unreasonable agent commission for title insurance paid to an agent not licensed in West Virginia, for deed preparation not performed by an attorney licensed to practice in West Virginia, and an excessive $200 notary fee.

RMS argues that Ms. Lavis is not entitled to summary judgment as to any of her claims. It contends that her rescission was not valid because she did not—and still has not—tendered the proceeds of the loan. It further argues that it did not misrepresent amounts due or its right to foreclose, beyond the brief and unintentional inclusion of an erroneous tax charge of $29.38. RMS also contends that W.Va. Code § 46A-2-128(d) does not apply to closing costs because those costs are not "incidental to a principal obligation," and, in any event, were not unreasonable. (RMS Resp. at 18.)

RMS moves for summary judgment as to all of the Plaintiff's claims.[7] It argues that there is no evidence that any statements made to Ms. Lavis prior to her entering into the reverse mortgage constitute unconscionable inducement, and stress that she signed documents confirming her understanding of the actual loan terms. RMS further asserts that the evidence confirms that it acted in accordance with the law to collect legally permissible debts that Ms. Lavis incurred by failing to purchase insurance or pay property taxes during the loan term. It further argues that there is no evidence that it breached the contract by failing to return or properly apply funds paid by Ms. Lavis for insurance and taxes, and that it did not breach the duty of good faith or fair dealing. Finally, as discussed above, RMS contends that Ms. Lavis' rescission claims are defeated because she has not tendered the loan proceeds, and she testified that she would need to obtain a loan in order to return the loan proceeds or pay any amount found to be due.

---

7 RMS' motion indicates that it seeks judgment on all remaining claims. However, Count V, alleging refusal of payment in violation of W.Va. Code § 46A-2-115, is not expressly addressed in its motion.

Ms. Lavis contends that RMS induced her to enter into the reverse mortgage by describing it as a government loan with no interest and no payments, and furthered the misrepresentations by arranging for her to receive counseling from a non-independent source who failed to describe alternative financial options and conducted a rushed closing without offering Ms. Lavis time to review documents or ask questions. She further asserts that her WVCCPA allegations are supported by evidence that money was withheld to pay for insurance and not used for that purpose or returned to her and that certain settlement costs were not authorized under West Virginia law. Finally, she argues that she is not obligated to make any tender to effectuate rescission until the Court has determined the amount to which RMS is entitled, which she contends should occur after RMS' liability on other counts has been adjudicated.

### A. *Unconscionable Inducement*

West Virginia Code § 46A-2-121(a)(1) permits a court to refuse to enforce an agreement if it was "induced by unconscionable conduct such as affirmative misrepresentations, active deceit or concealment of a material fact." The Fourth Circuit has found that this provision of the WVCCPA "authorizes a stand-alone unconscionable inducement claim which…may be based entirely on evidence going to process and requires no showing of substantive unfairness." *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 283 (4th Cir. 2016). The court further reasoned that an unconscionable inducement claim "will turn not on status considerations that are outside the control of the defendant, but instead on affirmative misrepresentations or active deceit." *Id.* at 286.

Ms. Lavis stated that an RMS agent, Mr. Schindler, told her that the reverse mortgage would ensure she would not have to make any house payments, that it was a government loan, and

that she would never have to pay any interest. The conversation did not address whether she would be required to pay taxes or insurance. She assumed she would have to pay taxes, but did not realize she would have to pay for insurance. Ms. Lavis also testified that RMS arranged her loan counseling with a specific counselor of its choice, and did not give her a list of counselors, including counselors based in West Virginia. She signed a list of counselors when she completed the loan application in September 2013—but she received her counseling months earlier, in June of 2013, and there is no evidence that she received the list prior to her counseling appointment. She signed a form after receiving the loan counseling, confirming that the counseling included various required topics that she now testifies were not mentioned. The loan application documents and the loan closing documents signed by Ms. Lavis disclose the details of the loan, including the interest rate, the fact that it was government insured, and the requirement that the borrower maintain and pay for property insurance and taxes.

The Court finds that Ms. Lavis' signature on the loan application and closing documents, as well as the Certificate of HECM Counseling form, defeats her claim for unconscionable inducement. In *McFarland*, the plaintiff alleged that the defendant had unconscionably induced him into refinancing his home for more than it was worth by convincing him of a heavily inflated home value. In contrast to the situation here, the actual home value was not disclosed in loan documents. Here, Ms. Lavis asserts that she was told there was no interest—but she signed documents detailing the interest rates and the circumstances under which she could be required to pay interest. She asserts that she was told the loan was a government loan—but she signed documents explaining that it was government insured and detailing HUD's role in the reverse mortgage. She asserts that she construed the statement that she would not have to make house

payments to mean she would not have to pay for insurance—but she signed documents informing her that she would be responsible for maintaining insurance and paying her property taxes. She asserts that she did not receive independent counseling—but she signed the HECM Counseling form shortly after her counseling session, verifying that the counselor discussed the required topics, and she later signed counseling verification forms stating that she had receiving independent counseling. Generally, "[a] party to a contract has a duty to read the instrument" and will be bound to its terms. Syl. Pt. 4, *Am. States Ins. Co. v. Surbaugh*, 745 S.E.2d 179, 180 (W. Va. 2013); *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 306 (4th Cir. 2001); *Knapp v. Am. Gen. Fin. Inc.*, 111 F. Supp. 2d 758, 763–64 (S.D.W. Va. 2000). Therefore, because Ms. Lavis has not produced evidence of any misleading or deceptive statements that were not followed by accurate written documents she signed, the Court finds that RMS is entitled to summary judgment as to Count II.

## B. WVCCPA – Misrepresentation and Unfair Debt Collection

The WVCCPA bars use of deceptive or misleading representations to collect debts. The statute specifies that this provision includes "[a]ny false representation or implication of the character, extent or amount of a claim against a consumer, or of its status in any legal proceeding." W.Va. Code § 46A-2-127(d). This Court has previously found that this provision of the WVCCPA is applicable to RMS's attempts to collect charges for insurance and/or taxes paid on behalf of reverse mortgage customers. (Mot. to Dismiss Mem. Op. at 10-11); *see also Woods v. Reverse Mortg. USA, Inc.*, No. 2:17-CV-00256, 2017 WL 4399201, at *6 (S.D.W. Va. Sept. 29, 2017) (Copenhaver, J.). The WVCCPA further prohibits "[t]he collection of or the attempt to collect any interest or other charge, fee or expense incidental to the principal obligation unless

such interest or incidental fee, charge or expense is expressly authorized by the agreement creating or modifying the obligation and by statute or regulation."  W. Va. Code § 46A-2-128(d).

The Settlement Statement includes a settlement or closing fee of $700, lender's title insurance of $775 (with an agent's portion of $718.10), a deed preparation fee of $60, and a $200 notary fee, all paid to WFG Lender Services, LLC.  The Plaintiff challenges the legality and reasonableness of these fees under Section 46A-128(d).  The Court finds that the closing costs in this case do not constitute a "claim" for purposes of the WVCCPA.  They are charges and fees for services and products that are both charged and paid at the time of the loan closing.  Ms. Lavis' complaint included a claim under the Residential Mortgage Lender, broker, and Servicer Act (RMLBSA), which the Court dismissed as untimely.  That statute prohibits certain excessive and/or undisclosed fees associated with mortgages and provides remedies for violations.  Section 128(d) of the WVCCPA is directed toward collection-related fees and expenses, as opposed to closing costs on a mortgage.  Therefore, the Court finds that RMS' motion for summary judgment must be granted as to Count IV to the extent it is based on improper closing costs.

RMS purchased insurance policies and sought to collect the costs from Ms. Lavis.  It also paid property taxes on one occasion, and mistakenly sought to charge Ms. Lavis for property taxes as to an unrelated property on another occasion.  RMS contends that the mistaken property tax charge is a bona fide error and no liability attaches, pursuant to W. Va. Code § 46A-5-101(8).  The Court finds that RMS has not established, as a matter of law, that it maintained procedures reasonably adapted to avoid any such violation.  A reasonable fact finder could conclude that additional review of liabilities identified by the systems used by RMS, prior to sending collection letters and adding fees to customer's accounts, are necessary to avoid violations.

The Settlement Statement included a charge of $2,113.57 for "homeowner's insurance for 1 year to State Farm," which is not accounted for in the records. A policy from Aegis Insurance was cancelled (after RMS had sent the first letters warning Ms. Lavis of her responsibility to obtain insurance), but the policy premium was substantially less than $2,113.57, and Ms. Lavis testified that she did not receive a refund. RMS also contends that it did not receive a refund for the policy cancellation. Neither Ms. Lavis nor RMS recalls the purchase of the Aegis policy. Thus, there is a factual dispute regarding what happened to the $2,113.57 that Ms. Lavis paid for insurance in the loan settlement. The total amount expended for insurance by RMS total less than $2,000. A reasonable juror could find that RMS retained the money dedicated for insurance, did not use it to purchase insurance, and sent Ms. Lavis misleading and false debt collection notices seeking to collect charges for insurance purchases while retaining that money. A reasonable juror could also conclude that Ms. Lavis did receive a refund for insurance purchased with the $2,223.57, and was responsible for the charges incurred by RMS to purchase insurance. Therefore, neither party is entitled to summary judgment with respect to Count III when the facts are viewed in the light most favorable to the opposing party.

### C. Breach of Contract

In West Virginia, a claim for breach of contract requires "the existence of a valid, enforceable contract; that the plaintiff has performed under the contract; that the defendant has breached or violated its duties or obligations under the contract; and that the plaintiff has been injured as a result." *McNeely v. Wells Fargo Bank, N.A.*, No. 2:13-CV-25114, 2014 WL 7005598, at *9 (S.D.W. Va. Dec. 10, 2014) (Goodwin, J.) (citations and quotation marks omitted.) A breach of the duty of good faith implied in all contracts "does not give rise to an independent cause

of action." *Doyle v. Fleetwood Homes of Virginia, Inc.*, 650 F. Supp. 2d 535, 540 (S.D.W. Va. 2009) (Copenhaver, J.). "[F]ailure to allege a breach of contract [is] fatal to [a] claim for a breach of the implied covenant of good faith and fair dealing." *Evans v. United Bank, Inc.*, 775 S.E.2d 500, 509 (W.Va. 2015).

As the Court noted in ruling on the motion to dismiss, the Home Equity Conversion Loan Agreement permits Ms. Lavis to pay for taxes and insurance directly, and indicates that any money withheld for such purposes will be returned if she pays those charges. The Court discussed the factual dispute regarding the money withheld for insurance and subsequent purchase of insurance policies. Given that factual dispute, the Court finds that RMS has not met its burden of demonstrating that it is entitled to summary judgment as to Count VI.

### D. Rescission

The Court outlined the law regarding rescission under the Truth in Lending Act (TILA) in its opinion on the motion to dismiss. In short, TILA gives borrowers the right to rescind covered transactions within three days, or within three years if the lender failed to provide proper disclosure forms. 15 U.S.C. § 1635(a),(f). The borrower must provide written notice of the rescission, after which the creditor has twenty (20) days to "return any money or property…and shall take any action necessary to reflect the termination of the security interest." 12 C.F.R. § 1026.23(a), (d). After the creditor satisfies its obligations, the borrower must tender any money or property received from the creditor, or its reasonable value. *Id.* at § 1026.23(d)(3). The procedures for the return of money or property by both parties "may be modified by court order." *Id.* at § 1026.23(d)(4). The Court found that Ms. Lavis was not required to tender the loan proceeds to bring a claim for rescission, but noted that "Ms. Lavis will [ultimately] be required to tender the

loan proceeds to return the parties to status quo ante in order to complete rescission and void the loan." (Mot. to Dismiss Op. at 15.)

Neither party has set forth a clear statement regarding the amount of loan proceeds subject to tender in a rescission. Ms. Lavis contests some of the fees associated with her loan, and the Court has found that she is entitled to challenge those fees in determining the appropriate tender. In addition, Ms. Lavis indicates that she would offset the amount of any tender with any compensatory or statutory damages due to her as a result of her other claims. RMS has not returned property or money associated with the loan, and Ms. Lavis' testimony demonstrates that she is not prepared to immediately tender the loan proceeds. Given the circumstances and the equitable nature of rescission, the Court finds that neither party is entitled to summary judgment. The Court further finds that rescission should be resolved following the resolution of the other claims in order to better evaluate the parties' respective positions and to permit Ms. Lavis to offset her tender obligation and attempt to obtain financing, if needed, to complete the rescission.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Plaintiff's Motion for Partial Summary Judgment* (Document 27) be **DENIED**. The Court further **ORDERS** that *Defendant Reverse Mortgage Solutions, Inc.'s Motion for Summary Judgment* (Document 29) be **GRANTED** as to Count II, **GRANTED in part** as to Count IV, to the extent Count IV relates to closing costs, and **DENIED** as to Counts III, VI, VII, and VIII.

The Court **ORDERS** that the Defendant's *Motion for Leave to File Supplemental Evidence in Support of Motion for Summary Judgment* (Document 49) be **GRANTED**, and that the parties' *Joint Motion for Extension of Pretrial Deadline for Mediation* (Document 48) be **GRANTED**.

The Court further **ORDERS** that the parties engage in mediation[8] within **TEN** days of the entry of this Order.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: May 9, 2018

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

---

8 Should the parties wish to mediate with a United States Magistrate Judge, they may file a motion requesting that the Court refer this matter for mediation.